IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID L. DOWLING, | ) | CASE NO. 1:16-cv-02180 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff David L. Dowling ("Plaintiff" or "Dowling") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I. Procedural History

Dowling protectively filed[1] his application for SSI on February 8, 2013.[2] Tr. 10, 110,

209-214, 280. He alleged a disability onset date of June 1, 2011 (Tr. 10, 209, 280), and alleged

disability due to multiple physical injuries, alcohol abuse, knee and shoulder problems, hammer

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 5/17/2017).

[2] Dowling had filed an earlier application on May 10, 2012, which was denied. Tr. 35.

toes, and lower back pain. (Tr. 96, 131, 137, 284). After initial denial by the state agency (Tr. 131-133) and denial upon reconsideration (Tr. 137-138), Dowling requested a hearing (Tr. 139-141). A hearing was held before Administrative Law Judge Mary Lohr ("ALJ Lohr") on January 12, 2015. Tr. 78-83. Dowling could not attend the January 12, 2015, hearing because of inclement weather and a car accident but Attorney Chopra appeared on Dowling's behalf. Tr. 80. Attorney Chopra indicated that Dowling might meet the requirements of Listing 12.05C ("Intellectual Disability") but prior consultative examinations had not included IQ testing. Tr. 80-82. Thus, Attorney Chopra requested and the ALJ agreed to have IQ testing performed. Tr. 80-82. ALJ Lohr indicated that the hearing would be rescheduled. Tr. 83.

After completion of additional testing, on June 17, 2015, Administrative Law Judge James M. Martin ("ALJ") conducted a hearing. Tr. 29-77. In his July 17, 2015, decision (Tr. 7-28), the ALJ determined that Dowling had not been under a disability since February 8, 2013, the date the application was filed. Tr. 10, 21. Dowling requested review of the ALJ's decision by the Appeals Council. Tr. 6. On June 27, 2016, the Appeals Council denied Dowling's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A. Personal, educational, and vocational evidence

Dowling was born in 1970. Tr. 20, 39, 209. For about a year prior to the hearing, Dowling lived in a house by himself. Tr. 53. Prior to that, Dowling was homeless. Tr. 56. While in school, Dowling was enrolled in special education classes but graduated high school. Tr. 39-40. Dowling last worked in the demolition industry around 2011. Tr. 37. He was in that industry for about 5-6 years (Tr. 39) working for his brother's demolition company. (Tr. 42, 61). His work involved using a sledgehammer to knock down walls and lifting heavy pieces of wall

and placing them into a dumpster.  Tr. 37.  He left the demolition job because of back pain.  Tr. 37.  Prior to working in the demolition industry, Dowling worked for about 20 years hanging drywall.  Tr. 39, 61.  Also, after leaving the demolition job, he briefly, i.e., not even half a day, tried doing drywall but was unable to continue that job because the job required lifting that also hurt his back.  Tr. 37-38.  When he worked hanging drywall, Dowling indicated it took him years to be able to work on his own doing measurements.  Tr. 40-41.

## B.    Medical evidence[3]

### 1.    Treatment records

In May and July of 2013, one of Dowling's treating physician Cynthia Caja, D.O., noted that referrals would be made for psychiatry/counseling once Dowling had insurance to attend. Tr. 444, 448.

In August 2013, Dowling was treated at the emergency room for a suicide attempt.  Tr. 462-474.  He was taken to the emergency room by Geauga Family Services.  Tr. 468.  He reported that his mother kicked him out of the house because he was intoxicated.  Tr. 468.  He proceeded to get in a fight with his girlfriend over the phone and indicated that he wanted to kill himself.  Tr. 466, 468.  At the emergency room, Dowling indicated that he just said he was going to kill himself because he was angry.  Tr. 468.  The assessment was alcohol intoxication and Dowling was discharged.  Tr. 468.

During an October 23, 2013, primary care visit with Dr. Robert Tupa, Dowling reported that his depression medication was not helping and he wanted to try another medication.  Tr. 578-580.  Dr. Tupa encouraged Dowling to have a consultation with psychiatry regarding his depression and for further adjustment to his medication and to obtain counseling.  Tr. 580.

---

[3] Dowling's sole argument relates to the ALJ's Step Three finding regarding Listing 12.05C.  Accordingly, the evidence is generally limited to relevant mental impairment evidence.

In November 2013, Dowling sought mental health treatment at Signature Health. Tr. 675. During his November 12, 2013, diagnostic assessment, Dowling reported that he was sad and depressed with chronic pain in his body. Tr. 675. He reported suicidal ideation but denied a plan. Tr. 675. Dowling had been homeless for a year since he lost his home and was sleeping in his mother's barn. Tr. 675. The initial assessment was major depressive disorder, recurrent, moderate and history of alcohol abuse. Tr. 675. Dowling started individual therapy sessions on November 21, 2013. Tr. 673. Dowling appeared disheveled. Tr. 673. He again reported living in his mother's barn. Tr. 673. He often looked at the floor while talking and his mood was depressed. Tr. 673. On December 2, 2013, Dowling attended an individual counseling session (Tr. 669) and, on that same date, he saw Dr. Peter G. Kontos of Signature Health for a psychiatric evaluation (Tr. 664-668). Dr. Kontos's diagnoses included major depressive disorder, moderate degree, recurrent; mood disorder secondary to chronic pain of repetitive injuries to arms, shoulders, back and knees; and past history of alcohol abuse, currently abstinent in full remission of all substance and alcohol. Tr. 667. Dr. Kontos found that Dowling appeared moderately depressed, with underlying anxiety, frustration and worry coupled with chronic pain syndrome. Tr. 667. Dr. Kontos prescribed medication and recommended that Dowling continue with individual psychotherapy and cognitive behavior therapy. Tr. 667-668. Dowling continued receiving services through Signature Health through December 2013. Tr. 658.

After Dowling moved from Ashtabula to Geauga County, Dowling was referred by Signature Health to Ravenwood Mental Health Treatment Center. Tr. 724, 734. He saw Patricia Spadaro, LISW, for an Intake Evaluation on June 12, 2014. Tr. 724-736. Dowling reported that he had being receiving counseling services because he was "suicidal," noting that he had attempted suicide three times. Tr. 724. Dowling reported having a learning disability,

indicating that he could not spell and read well. Tr. 726. He reported that he had stopped drinking on a daily basis in 2012 but Ms. Spadaro noted that Dowling smelled of alcohol at the session. Tr. 728. Ms. Spadaro observed that Dowling's eye contact was direct, his speech was slightly slurred, his demeanor was average and his activity was slowed; his thought process was circumstantial; his mood was slightly depressed and his affect was slightly flat; and his intelligence is estimated as average. Tr. 731. Ms. Spadaro assessed alcohol dependence and depressive disorder, NOS. Tr. 735. In July 2014, Dowling started seeing Jennifer Marut, LPCC, for individual counseling sessions and case management services and continued seeing her through at least September 2014. Tr. 700-711, 714-721. Also, starting in August 2014, Dowling saw Dr. James Rodio, M.D., for pharmacologic management and psychiatric treatment. Tr. 712-713. Dr. Rodio diagnosed alcohol dependence and major depressive disorder and prescribed medication. Tr. 712.

Dowling was admitted to the emergency room at University Hospitals in October 2014 due to an alcohol and drug overdose after his girlfriend left him. Tr. 880, 907, 1154. Dowling called Ravenwood stating he was going to kill himself and take some pain pills. Tr. 880. He was found by the sheriff and admitted to the emergency room on October 8, 2014. Tr. 882, 1154. He was discharged from the emergency room on October 15, 2014, and admitted to the inpatient/behavioral health unit of University Hospitals where he remained until October 20, 2014. Tr. 882, 1154. Dowling declined formal drug treatment, including residential rehab, but, indicated he would consider drug treatment at Ravenwood. Tr. 1154. During his admission, Dowling reported that he had been kicked out of his mother's house. Tr. 897. He indicated he was living in a house behind his girlfriend's mother's house and was a caregiver to his girlfriend's mother – assisting her with three meals per day and going to her appointments with

her.  Tr. 897.  His girlfriend was not living with him.  Tr. 897.  At discharge, Dowling's mood was good; he denied depression and anhedonia; his affect was full, not labile, appropriate; he denied suicidal/homicidal ideation; his insight was fair to poor; his judgment was fair; and he was alert and oriented to person, time and place.  Tr. 1154.

Dowling saw Dr. Rodio for follow up on November 4, 2014, and December 23, 2014. Tr. 698, 1291-1292.  Dowling denied suicidal/homicidal ideation and reported that his girlfriend expected him not to drink and he planned not to.  Tr. 698.  During both the November and December visits with Dr. Rodio, Dowling's October overdose was discussed.  Tr. 698, 1291. Dowling indicated he did not need inpatient rehab.  Tr. 698, 1291.  It was noted that alcohol could be an accelerant to his suicidal behavior.  Tr. 1291. His medications were continued.  Tr. 698, 1291.

## 2. Opinion evidence

### a. Consultative opinions

*Richard C. Halas, M.A.*

On August 2, 2012, clinical psychologist Richard C. Halas, M.A., saw Dowling for the purpose of conducting a consultative examination.  Tr. 352-357.  Dr. Halas observed that Dowling presented himself in a disheveled and unkempt manner.  Tr. 356.  Dowling relayed that he was in special education classes and had an IEP while in school.  Tr. 352, 353.  He maintained below average grades but he never failed or was held back.  Tr. 352.  Dowling admitted to a history of legal problems, indicating he had been charged with DUI three times.  Tr. 353. Dowling reported that he self-medicated by drinking daily and using marijuana occasionally because he did not have insurance.  Tr. 353.  Dr. Halas diagnosed polysubstance abuse and dysthymia.  Tr. 356.

Dr. Halas opined that Dowling would appear to have slight problems in his ability to understand, remember and carry out instructions, noting that the mental status evaluation indicated that Dowling had low average intellect capacities and he struggled at times to understand information and problem solve. Tr. 356. Dr. Halas opined that Dowling would appear to have little to no problem in his ability to maintain attention and concentration, maintain persistence and pace to perform simple tasks and to perform multi-step tasks, noting that during mental status testing, Dowling could concentrate and recall five digits forward and three of three items after five minutes and he could do simple calculations and serial 7s. Tr. 356. Dr. Halas opined that Dowling would appear to have problems in his ability to respond appropriately to supervision and coworkers in a work setting, indicating that Dowling's depression and drinking would likely restrict his ability to be effective and appropriate with others. Tr. 356. Dr. Halas opined that Dowling would appear to have little to no difficulty in his ability to respond appropriately to work pressures in a work setting. Tr. 357.

### Jennifer Haaga, Psy.D.

On May 1, 2013, clinical psychologist Jennifer Haaga, Psy.D., saw Dowling for the purpose of conducting a consultative examination. Tr. 421-427. A friend drove Dowling to the examination. Tr. 421. Dowling was living with his mother and her friend. Tr. 422. He was staying in the barn by her house until he found a place. Tr. 422. Dowling reported graduating from high school, noting a history of learning difficulties and enrollment in special education classes. Tr. 422. Although he was not held back in school, his grades were poor. Tr. 422. Dowling reported that he had cut back on his drinking. Tr. 422. Dowling indicated he worked in the past hanging dry wall and he did demolition work. Tr. 423. Dowling appeared disheveled. Tr. 424. Overall, his interaction with the examiner was adequate. Tr. 424. Dr. Haaga observed

that Dowling's mood was depressed and he had a congruent affect. Tr. 424. Dowling reported past suicide attempts, stating "I am tired of pain and not being able to work and I don't have money." Tr. 424. Dr. Haaga's overall impression of Dowling's cognitive functioning was low average range of ability. Tr. 425. Dr. Haaga noted that Dowling's attention and concentration and his ability to abstract were adequate. Tr. 425. Dowling reported some difficulties with recent memory functioning but demonstrated no difficulties during the evaluation. Tr. 425. Dr. Haaga observed that Dowling appeared to have adequate common sense reasoning and judgment and appeared cognitively and psychologically capable of living independently and making decisions about his future. Tr. 425. Also, Dr. Haaga found that Dowling appeared capable of seeking appropriate services in the community. Tr. 425.

Dr. Haaga diagnosed major depressive disorder, recurrent, moderate; adjustment disorder with anxiety; alcohol dependence with psychological dependence, early partial remission; and borderline intellectual functioning. Tr. 425. As far as Dowling's functional abilities, Dr. Haaga opined that Dowling was capable of comprehending and completing simple, routine tasks but may have difficulties with understanding, remembering, and following instructions when the tasks are more complex and he was likely to remember instructions consistent with someone of borderline intellectual functioning. Tr. 426-427. Due to Dowling's symptoms of depression and anxiety, Dr. Haaga opined that Dowling would likely have difficulties in the area of maintaining concentration, persistence and pace to perform simple tasks and perform multi-step tasks. Tr. 427. Dr. Haaga found no limitations in Dowling's ability to respond appropriately to supervision and coworkers in a work setting. Tr. 427. Dr. Haaga opined that Dowling's lack of social support system may negatively impact his ability to withstand stress and pressure of work

activities, noting that Dowling had reported a suicide attempt the prior fall and had a history of substance abuse and likely drank to manage stressors.  Tr. 427.

   *J. Joseph Konieczny, Ph.D.*

On March 19, 2015, psychologist J. Joseph Konieczny, Ph.D., saw Dowling for a psychological evaluation.  Tr. 1293-1295.  Dr. Konieczny administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), reviewed the reports of Drs. Halas and Haaga, and reviewed treatment notes from Ravenwood Center dated July 1, 2014, through November 4, 2014.  Tr. 1293.  Dowling had taken a taxi to the evaluation.  Tr. 1293.  Dr. Konieczny indicated that Dowling was pleasant and cooperative and his effort during the testing seemed appropriate.  Tr. 1293.  Dowling's WAIS-IV scores were as follows: Verbal Comprehension – 74; Perceptual Reasoning – 58; Working Memory – 80; Processing Speed – 65; and Full Scale IQ – 63.  Tr. 1293-1294.  Dr. Konieczny opined that Dowling's Full Scale IQ score placed him in the extremely low range of adult intellectual functioning.  Tr. 1294.  Dr. Konieczny noted "a moderate degree of scatter among the various index areas."  Tr. 1294.  Dr. Konieczny further indicated that, "[a]lthough there [was] no psychometric data regarding pre-morbid levels of functioning, given David's apparent educational and vocational history (high school graduate, driver's license, periodic formal work history) it would appear that he has likely suffered from some mild intellectual decline that may be a residual effect of his history of alcohol use."  Tr. 1294.  Dr. Konieczny diagnosed mild neuro-cognitive disorder due to history of alcohol use, without current use and borderline intellectual functioning.  Tr. 1294.

With respect to Dowling's functional abilities, Dr. Konieczny opined that (1) as a result of Dowling's intellectual limitations, Dowling would have some mild limitations in his ability to understand, remember and carry out instructions; (2) Dowling showed no significant limitations

in the area of attention and concentration and participating in single and multi-step tasks; (3) as a result of Dowling's intellectual limitations, Dowling would have some diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to severe supervision and interpersonal situations in the work setting but he would seem capable of responding appropriately to normal such situations; and (4) as a result of Dowling's intellectual limitations, Dowling would have some diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to severe pressure situations in the work setting but he would seem capable of responding appropriately to normal such situations.  Tr. 1294.

### b. Reviewing opinions

_Mary K. Hill, Ph.D._

As part of a prior disability application filed by Dowling, on August 18, 2012, state agency reviewing psychologist Mary K. Hill, Ph.D., completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment.  Tr. 89-90, 91-92.  As part of the PRT, Dr. Hill opined that Dowling had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 89.  There were no repeated episodes of decompensation.  Tr. 89.  In the Mental RFC Assessment, Dr. Hill opined that, in most areas, Dowling was not significantly limited.  Tr. 91-92.  Dr. Hill opined that Dowling was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, noting that Dowling had poor insight and significant alcohol abuse and psychological symptoms would limit his concentration, persistence and pace and his ability to tolerate normal

work pressures but Dowling would be able to perform various tasks with no multi-tasking and no strict time limitations. Tr. 92. Dr. Hill also opined that Dowling was moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, noting that Dowling was observed to be disheveled with body odor, had poor judgment and insight, and his "[i]nteractions with others limited to conventional level." Tr. 92.

### *Cynthia Waggoner, Psy.D.*

On May 8, 2013, state agency reviewing psychologist Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment. Tr. 101-102, 105-107. As part of the PRT, Dr. Waggoner opined that Dowling had moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence or pace but no difficulties in maintaining social functioning. Tr. 101. There were no repeated episodes of decompensation. Tr. 101. In the Mental RFC Assessment, Dr. Waggoner opined that, in most areas, Dowling was not significantly limited. Tr. 105-107. Dr. Waggoner found moderate limitations in a few categories, including in the ability to understand and remember detailed instructions but concluded that Dowling retained the ability to perform simple and routine tasks of 1-2 steps. Tr. 106. Dr. Waggoner found moderate limitations in the ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period but concluded that Dowling retained the ability to work in an environment without fast paced production standards or quotas and could concentrate for 2 hour

periods, make simple decisions and sustain moderate levels of pace, persistence and production. Tr. 106. Finally, Dr. Waggoner found moderate limitations in the ability to respond appropriately to changes in the work setting but, concluded that Dowling retained the ability to work in an environment where changes are infrequent and easily explained. Tr. 106-107.

### Kristen Haskins, Psy.D.

Upon reconsideration, on September 25, 2013, state agency reviewing psychologist Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment. Tr. 117-118, 121-123. Dr. Haskins' opinions were similar to those offered by Dr. Waggoner. Tr. 117-118, 121-123.

## C. Educational records – Grand Valley Local Schools

Dowling's school records show that Dowling generally received poor grades. Tr. 328-331, 333, 350. On June 15, 2012, Mark Stimecz, a guidance counselor, responded to a request from the Social Security Administration to Grand Valley Local Schools regarding Dowling's school records. Tr. 347-349. When asked if Dowling had any educational disabilities, Mr. Stimecz checked the box entitled "mental retardation/mentally impaired/intellectually limited." Tr. 348. Mr. Stimecz indicated that Dowling was in special education classes. Tr. 348. However, Dowling did not repeat any grades. Tr. 348.

## D. Testimonial evidence

### 1. Plaintiff's testimony

Dowling testified and was represented at the hearing. Tr. 36-61, 69-70, 72-75. Dowling is unable to drive because he lost his driver's license due to a DUI. Tr. 47. Dowling lives alone and prepares his own meals. Tr. 53-54. He also performs household chores but not a lot because it hurts his back. Tr. 54-55. Dowling is not able to read and write basic English

very well.  Tr. 69.  He is able to read street signs when driving and could read a basic grocery list, e.g., "go pick up milk, eggs, and butter."  Tr. 69.  Since 2012, Dowling drinks only occasionally, i.e., every couple months.  Tr. 72-73.  Prior to 2012, he was drinking 6-12 beers daily.  Tr. 72-73.  In October 2014, Dowling had a suicide attempt brought on by his pain and his girlfriend.  Tr. 73-75.

## 2.  Vocational expert's testimony

Vocational Expert Kevin Yi ("VE") testified at the hearing.  Tr. 62-69, 70-72.

The VE described Dowling's past work to be that of construction worker, a semi-skilled, heavy level job as described under the DOT.  Tr. 63.  The VE indicated that Dowling performed the jobs at the very heavy level.  Tr. 71-72.  The ALJ asked the VE a number of hypotheticals, including one in which the ALJ asked the VE to assume an individual of Dowling's age and with his education and past relevant work who was limited to less than a full range of sedentary work (i.e., lift/carry 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour day; stand and walk for 2 hours each in an 8 hour day; and push and pull as much as he could lift/carry); could frequently handle bilaterally; could frequently finger bilaterally; could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, and crawl; could never be in an environment of unprotected heights, moving mechanical parts, or operating a motor vehicle; limited to performing simple and routine repetitive tasks and not at a production-rate pace; and limited to simple work-related decisions both in using judgment  and in dealing with changes in the work setting.  Tr. 65-66.  The VE indicated the described individual could not perform Dowling's past work.  Tr. 66.  However, there were sedentary,

unskilled jobs that the hypothetical individual could perform, including final assembler, order clerk, and toy assembler.[4]  Tr. 67.

## E.        Disability examiner's observations

On May 24, 2012, a Social Security interviewer named D. Heider met with Dowling for a face-to-face interview.  Tr. 224-225.  D. Heider observed that Dowling had a disheveled appearance (long stringy hair and somewhat dirty clothes).  Tr. 224.  Also, it was noted that Dowling had difficulty answering and was a poor historian about date and names of potential treating sources.  Tr. 224.

On February 26, 2013, R. Hawkins, another Social Security interviewer, spoke with Dowling over the telephone.  Tr. 281-282.  R. Hawkins noted that Dowling exhibited difficulties talking and answering, stating "It was quite difficult to hear claimant on the phone.  There was so much static on the line and he was mumbling a lot.  I had to call him back 6 times to get all the information needed for the claim . . . difficult to understand him.  He kept saying I don't know or gave vague answers to many of the questions.  He acted as if I was supposed to know the answers."  Tr. 281.

## III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

---

[4] The VE provided state and national job incidence data for the jobs identified.  Tr. 66-67.

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

# IV. The ALJ's Decision

In his July 17, 2017, decision, the ALJ made the following findings:[5]

1.   Dowling has not engaged in substantial gainful activity since February 8, 2013, the application date.  Tr. 12.

2.   Dowling has the following severe impairments: alcohol and substance addiction disorder; borderline intellectual functioning; degenerative disc disease; osteoarthritis; affective disorder; and anxiety disorder.  Tr. 12

3.   Dowling did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 12-14.

4.   Dowling has the RFC to perform sedentary work subject to the following limitations – can frequently handle and finger bilaterally; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; can never be in environment of unprotected heights, moving mechanical parts, or operating a motor vehicle; limited to performing simple, routine and repetitive tasks but not at a production rate pace; and limited to simple work related decisions.  Tr. 14-19.

5.   Dowling is unable to perform any past relevant work.  Tr. 19-20.

6.   Dowling was born in 1970 and was 43 years old, defined as a younger individual, on the date the application was filed.  Tr. 20.

7.   Dowling has at least a high school education and is able to communicate in English.  Tr. 20.

8.   Transferability of job skills is not material to the determination of disability.  Tr. 20.

9.   Considering Dowling's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Dowling could perform, including final assembler, order clerk, and toy assembler.  Tr. 20-21.

---

[5] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Dowling had not been under a disability since February 8, 2013, the date the application was filed.  Tr. 21.

## V. Parties' Arguments

Dowling asserts one challenge to the ALJ's disability determination.  He argues that the ALJ's determination that he did not meet Listing 12.05C is not supported by substantial evidence.  Doc. 14, pp. 14-19, Doc. 18, pp. 1-2.

In response, the Commissioner argues that the ALJ reasonably determined that Dowling did not meet or equal Listing 12.05C.  Doc. 17, pp. 10-16.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## B.  Dowling's Step Three argument

Dowling argues that the ALJ erred at Step Three when he found that Dowling did not meet Listing 12.05C. Listing 12.05 relates to intellectual disability.[6]  To qualify as disabled under that Listing, a claimant needs to satisfy <u>both</u> the diagnostic description in the introductory paragraph of Listing 12.05 <u>and</u> one of the four sets of criteria found in Subparts A through D. 20 C.F.R. § 416.925(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-355 (6th Cir. 2001). The diagnostic description is as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009) (citing *Foster*, 279 F.3d at 354).  "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes*, 357 Fed. Appx. at 677.

The additional Subpart C criteria are:

---

[6] Effective September 3, 2013, the Social Security Administration replaced the term Mental Retardation with Intellectual Disability. 78 FR 46499-01 (Aug. 1, 2013).

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C.

The ALJ considered Listing 12.05C, stating:

Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although the claimant produced a full scale IQ of 63 (Ex. 30F, 2), placing him in the extremely low range of adult intellectual functioning, there is insufficient evidence in the record to show that the IQ was present prior to age 22 as required by the listing.

Tr. 14.

Dowling argues that "his record raised a 'substantial question' over whether his intellectual disorder met Listing 12.05C, and the ALJ's failure to even make passing reference to the Listing constituted reversible error." Doc. 14, p. 15. As is clear from the decision, the ALJ did consider Listing 12.05C. Thus, Dowling's claim that the ALJ did not even "make passing reference to the Listing" is unsupported by the record.

Dowling also argues that the ALJ erred because he did not discuss the diagnostic description criteria and appears to have confused the diagnostic requirement with the IQ requirement by concluding that Dowling failed to provide a qualifying IQ score as required by the Listing. Doc. 14, pp. 15-17. The Commissioner concedes that the ALJ erred by suggesting that, in order to satisfy the diagnostic description, a qualifying IQ score prior to the age of 22 is required. Doc. 17, p. 11. However, the Commissioner argues that any such error was harmless because Dowling has failed to demonstrate that he meets the diagnostic criteria.

As explained more fully below, the undersigned concludes that, even if the ALJ erred in his 12.05C analysis, reversal and remand is not warranted.

At the first, January 12, 2015, administrative hearing, Dowling's attorney suggested that Dowling's case might be a 12.05C case (Tr. 81); however, in her closing statement at the second, June 17, 2015, administrative hearing, Dowling's attorney no longer advanced the Step Three – Listing 12.05C – argument.[7]  Tr. 75-76.  Instead, Dowling sought to establish disability through a special vocational rule and/or at Step Five.  Tr. 75-76.

> ATTY: Your honor, the reason I was trying to establish the very heavy versus the heavy was because there is a grid rule -- and I was trying to find the exact numbering; haven't been able to find the number -- but it relates to someone who has a history of very arduous work.
>
> ALJ: Oh, special vocational profile.
>
> ATTY: Correct, yes.  So I wanted you to consider that in your decision as well, because he has had a history of very arduous work for the last 30 years or so.  <u>And although he does have a twelfth-grade education, it is special education.  And he has now been diagnosed with a 12.05C- qualifying IQ.  Now, I don't – we don't have the records in the file that indicate that it's prior to the age of 22.</u>
>
> ALJ: Right.
>
> ATTY: <u>So I'm not particularly asking for that listing specifically, because I don't think that we have the evidence for that listing.</u>  But I think the combination of all of those factors would allow you to consider that special vocational rule as well as a fifth-step finding of disability.

Tr. 75-76 (emphasis supplied).

These statements to the ALJ are contrary to Dowling's argument in this appeal, i.e., that there is evidence to establish that Dowling meets Listing 12.05C.

Dowling waived his challenge to the ALJ's Step Three determination based on the invited error doctrine.  "The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party

---

[7]  Dowling was represented at the administrative hearing and is represented in these proceedings by attorneys of the Law Offices of Paulette F. Balin and Associates, LLC.  Tr. 29, 178-179, 184, 338-339; Doc. 1.

to commit." *Harvis v. Roadway Express, Inc*., 923 F.2d 59, 60 (6th Cir. 1991). This doctrine "is a branch of waiver by which the courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside." *Id.* at 61. The doctrine of invited error has been applied to administrative proceedings, *see Johnson v. I.N.S.*, 971 F.2d 340, 343 (9th Cir. 1992); *St. Anthony Hosp. v. Dept. of H.H.S*, 309 F.3d 680, 696 (10th Cir. 2002); *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ*., 773 F.3d 509, 516 (4th Cir. 2014), including social security disability cases. *See Tracy v. Astrue*, 518 F.Supp.2d 1291, 1305-1306 (D.Kan. 2007) (the doctrine of invited error prevents a social security claimant's challenge to an ALJ's Step Three finding when the claimant's attorney made affirmative statements to the ALJ at the hearing that the claimant did not meet a listing); *Becker v. Colvin*, 2016 WL 4181335, * 4-5 (D.Kan. Aug. 8, 2016) ("Plaintiff informed the ALJ that he did not meet or equal any listing. He cannot now argue otherwise before this court."); *Gies v. Colvin*, 2016 WL 4943969, at *8, n.2 (E.D.Cal. Sept. 16, 2016) (claimant's attorney stated in his hearing brief that he did not meet a listing and "focused solely on step five of the evaluation ... due to a combination of his physical and mental impairments"; the court observed, "The doctrine of 'invited error' has been applied in social security cases and the Court finds no reason that it should not apply here."); *Williams v. Astrue*, 2011 WL 1059124, at *3 (D.Or. March 21, 2011).

Even if not waived based on the doctrine of "invited error," Dowling must demonstrate that his impairment satisfies the diagnostic description, i.e., "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." However, the evidence Dowling relies on is insufficient to make such a showing.

Dowling points to his poor academic record, difficulty understanding and problems with pretty much everything, and enrollment in special classes for the educational disability "mental retardation/mentally impaired/intellectually limited" to argue that he satisfies the diagnostic description of Listing 12.05C. Doc. 14, pp. 16-17. However, Dowling fails to establish how evidence of special education classes establishes deficits in adaptive functioning. *See Hayes*, 357 Fed. Appx. at 677 ("The adaptive skills prong evaluates a claimant's effectiveness in the areas such as social skills, communication skills, and daily-living skills."); *see also Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 540 (6th Cir. Jan. 21, 2014) ("[N]either circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two."). Furthermore, while Dowling was enrolled in special education classes, he did in fact graduate from high school and he was employed for many years working in the dry wall and demolition business. Tr. 39.

Also, to the extent that Dowling contends that evidence of special education classes establishes subaverage intellectual functioning prior to age 22, "poor academic performance" alone is not enough to demonstrate onset of subaverage intellectual functioning prior to age 22. *See Hayes*, 357 Fed. Appx at 677 ("[T]his Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two."). Additionally, Dr. Konieczny indicated that Dowling "would appear to suffer from some mild to moderate residual intellectual deficits as a result of his history of alcohol use." Tr. 1294. Dr. Konieczny's finding in this regard indicates that Dowling's intellectual deficits cannot be solely linked to an intellectual disability. *See e.g.,*

*Peterson*, 553 Fed. Appx. at 540 (finding claimant's claim of deficits in adaptive functioning prior to age 22 was "hamstrung by [claimant's] robustly documented history with alcohol[]").

Additionally, no physician diagnosed mental retardation. Both Dr. Haagas and Dr. Konieczny diagnosed borderline intellectual functioning. Tr. 425, 1294. While a diagnosis of mental retardation is not required in order for a claimant to satisfy Listing 12.05C, the lack of a mental retardation diagnosis is an appropriate consideration when assessing whether an impairment satisfies Listing 12.05C. *See Peterson*, 552 Fed. Appx. at 539 (citing *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007)).

Dowling also argues that his employment with his brother's company tends to suggest that the only reason he was employed was because a family member allowed him to work in a sheltered environment notwithstanding his intellectual deficits. Doc. 14, p. 17. Dowling worked at his brother's demolition company for about five or six years until 2011, after he worked hanging dry wall for almost 20 years, and only the demolition company, not the dry wall company(s) at which he worked, was owned by his brother. Tr. 39, 41, 42. Furthermore, the work for his brother's company was years after he turned 22. Thus, Dowling has not shown how evidence that he worked for his brother's company, even assuming that there is evidence that Dowling's work at his brother's company was in a sheltered environment, demonstrates onset of deficits prior to age 22.

For the reasons discussed above, even if Dowling had not waived his argument based on invited error, any purported infirmity in the ALJ's Step Three determination regarding Listing 12.05C does not warrant reversal and remand because Dowling cannot show that he satisfies the diagnostic criteria of Listing 12.05C. *See Todd v. Astrue*, 2012 WL 2576435 at *10 (N.D. Ohio May 15, 2012) ("No principle of administrative law or common sense requires us to remand a

case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005).

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 18, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).